# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2016AP2514-D |
| COMPLETE TITLE: | In the Matter of Disciplinary Proceedings Against Robert Zapf, Attorney at Law: |

Office of Lawyer Regulation,
Complainant-Respondent,
v.
Robert Zapf,
Respondent-Appellant.

---

DISCIPLINARY PROCEEDINGS AGAINST ZAPF

---

| | |
|---|---|
| OPINION FILED: | July 10, 2019 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 29, 2018 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | |
| COUNTY: | |
| JUDGE: | |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the respondent-appellant, there were briefs filed by *Richard J. Cayo, Stacie H. Rosenzweig, and Halling & Cayo, S.C.*, Milwaukee. There was an oral argument by *Richard J. Cayo*.

For the complainant-respondent, there was a brief filed by *Gregg Herman* and *Office of Lawyer Regulation*, Milwaukee. There was an oral argument by *Gregg Herman*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2016AP2514-D

STATE OF WISCONSIN                    :            IN SUPREME COURT

**In the Matter of Disciplinary Proceedings Against Robert Zapf, Attorney at Law:**

**Office of Lawyer Regulation,**

**Complainant-Respondent,**

    **v.**

**Robert Zapf,**

    **Respondent-Appellant.**

**FILED**

**JUL 10, 2019**

Sheila T. Reiff
Clerk of Supreme Court

ATTORNEY disciplinary proceeding. *Complaint dismissed.*

¶1  PER CURIAM.  Former Kenosha County District Attorney Robert D. Zapf appeals the report of Referee Dennis J. Flynn, who concluded that Attorney Zapf had committed two counts of professional misconduct and recommended that his license to practice law in Wisconsin be suspended for one year and that his resumption of the practice of law be subject to certain conditions.

¶2  After hearing oral argument and carefully reviewing this matter, we conclude that all three counts alleged against

Attorney Zapf must be dismissed. The Office of Lawyer Regulation (OLR) failed to demonstrate by clear, satisfactory, and convincing evidence, as required by Supreme Court Rule (SCR) 22.16(5), that Attorney Zapf violated the three ethical rules identified in its complaint. Because we dismiss the OLR's complaint in its entirety, we do not require Attorney Zapf to pay the costs of this proceeding.

**FACTUAL BACKGROUND**

¶3 Attorney Zapf was admitted to the practice of law in this state in 1974. After serving as an assistant district attorney for approximately six years, he was initially elected as the Kenosha County District Attorney in 1980 and served from 1981 to 1989. After a substantial period in private practice, he was appointed to the position of district attorney in 2005 and was reelected to continue serving in that position until he retired in January 2017.

¶4 In 1985, during Attorney Zapf's first period as district attorney, he was publicly reprimanded for communicating with a party who was represented by counsel and for failing to disclose information to defense counsel. In re Disciplinary Proceedings Against Zapf, 126 Wis. 2d 123, 375 N.W.2d 654 (1985).

¶5 Attorney Zapf testified in this proceeding that the 1985 reprimand affected him deeply and caused him to take steps over the remaining course of his career to ensure that evidence was turned over. He instituted a broad open-file policy in the Kenosha County District Attorney's office that, as acknowledged

2

by the grievant in this matter, amounts to the prosecution permitting defense attorneys to inspect the prosecution's entire file with the exception of work product generated by the prosecuting attorneys. Attorney Zapf even placed a copy machine in the district attorney's office on which defense counsel could copy portions of the prosecution files without charge.

¶6 Summarizing the referee's findings of fact in this proceeding is not an easy task. No section of the referee's report contains a precise listing of the facts as the referee found them. While the report does contain a section entitled "FACTS," in that section the referee simply recites the testimony given by the various individuals at the evidentiary hearing without identifying which assertions he accepted as true and which he did not.[1] In addition, there is a stipulation of facts that the parties prepared and that was received into evidence. There are facts stated throughout the discussion section of the referee's report. This opinion will summarize the facts as the referee appears to have found them by gleaning them from the discussion section of the report.

---

[1] Even in the "FACTS" section, the referee acknowledges that the facts set forth in that part of the report may not be fully accurate:

> The facts are as presented in the testimony and exhibits. Here some of the facts will be noted, but if they differ from the actual testimony and exhibits, then the actual testimony and exhibits are relied upon by the Referee and are controlling.

¶7   At least with respect to the broad outlines of the underlying facts, there does not appear to be any dispute. This disciplinary proceeding arises out of the actions of a Kenosha Police Department (KPD) officer, Kyle Baars. On April 14, 2014, Officer Baars assisted in transporting Markese Tibbs to a KPD police station. At that point Tibbs was a suspect in a homicide that had occurred earlier that day.[2][3] During the transportation or subsequent booking of Tibbs, Officer Baars came into possession of Tibbs' Illinois identification card. Officer Baars kept the Illinois ID card on his person at the end of his shift on April 14.

---

[2] The stipulation and the referee fail to note that the homicide, in which Anthony Edwards was killed, took place during what Edwards believed would be a drug transaction. As Attorney Zapf testified at the evidentiary hearing, Joseph Brantley and Tibbs set up the purported transaction as a way to rob Edwards of money and marijuana. Brantley shot Edwards as he was sitting in the driver's seat of his vehicle. Edwards drove his vehicle away but shortly thereafter crashed it into a home. The passenger in Edwards' vehicle, J.L., identified Brantley and Tibbs as the robbers and Brantley as the shooter.

[3] The referee does not note the fact that Tibbs had a connection to an ongoing investigation of a previous robbery that had occurred at the Shenanigan's liquor store. According to the stipulation in this case, a .22 caliber pistol had been recovered by the police in a getaway vehicle after the Shenanigan's robbery. One of the two suspects in the robbery, a man known as "Montriel," had been previously arrested at 1208 59th Street in Kenosha, but the other robber, identified as "Cali," had not been arrested. When Officer Baars arrived at the residence at the same address on 59th Street on April 14, 2014, after the police had tracked the two homicide suspects there, he observed that one of the suspects, Tibbs, resembled the individual named "Cali" that had been involved in the Shenanigan's robbery.

¶8  When Officer Baars started his shift the following morning, he was directed to assist in a second search of the residence at 1208 59th Street and was informed that the search was for handguns, ammunition, casings, and clothing.[4]

¶9  What happened during that second search on April 15, 2014, is not as clear. What is important for purposes of this opinion is what the officers other than Officer Baars knew about his conduct during the search and what part of that knowledge they shared with the police chief and with Attorney Zapf. That will be addressed below.

¶10  Officer Baars searched one of the bedrooms, where he found a blue backpack. Officer Baars alerted the other officers that he had located a backpack and that inside of it was a bullet. (The bullet was a .22 caliber bullet, not a .32 caliber bullet that matched the weapon used in the homicide of Anthony Edwards.) Officer Baars later recalled, and the referee seems to have found, that when the other officers entered the bedroom, he also handed the Tibbs ID to one of the detectives (Detective Traxler). After looking at the ID, Detective Traxler told Officer Baars that the .22 bullet and the ID should be placed back into the backpack and collected as evidence. Officer Baars

---

[4] The stipulation and the referee ignore the undisputed fact that at the time of the arrest of Tibbs and Joseph Brantley on April 14, 2014, KPD officers conducted a search of the residence on 59th Street in which the two men had been found. The officers, who apparently did not include Officer Baars, discovered a .32 caliber handgun and a quantity of marijuana that had been stolen from Edwards.

followed the detective's order. He did not inform Detective Traxler or any other officer that the ID had not been found initially in the backpack and that it had been in his possession from the day before. There is no evidence in the record that Detective Traxler or any of the other officers knew the source of the ID at that time. KPD Officer Brandie Pie photographed the backpack and its contents and then collected them as evidence.

¶11 From the very beginning of the description of the April 15, 2014 search, the referee concludes that Officer Baars had intentionally planted the ID (and maybe the bullet):

> Officer Baars did not advise any other KPD officers there that he had possession of the Illinois ID card and perhaps also the .22 caliber bullet on entering the residence before participating in the search. What this meant is that Officer Baars had planted the Illinois ID card and perhaps the .22 caliber bullet as evidence in a homicide investigation.

¶12 We need to pause the factual recitation at this point for some clarification. The referee at this early point in the recitation of facts concludes that Officer Baars "planted" the ID and perhaps the bullet. The term "planted" could be understood to mean different things. It could be used simply as a substitute for "placed," which would not necessarily connote malicious intent, or it could mean "negligently placed," which would connote a lack of care but not an intentional act. Finally, as seems to be most often the case, "planted" could be understood to connote an intentional placing of an item with an intent to implicate someone in a crime under false pretenses.

6

The use of the term "plant" in the stipulation in this case is not always clear. On the other hand, although the referee does not specify which connotation he was employing, it appears that he meant the term to mean the intentional planting of false incriminating evidence.

¶13 As will become clear below, ultimately it was discovered that Officer Baars did, in fact, place the .22 caliber bullet into the backpack and hand the ID to Detective Traxler with the intent to connect the bullet, the ID, and the backpack to Tibbs. What is important for purposes of this disciplinary case, however, is what was known at what time about the events that unfolded during the search on April 15, 2014. To describe Officer Baars' actions as "planting" the ID and the bullet implies that it was an established fact from the outset. Although we know now, with the benefit of hindsight, that those items were, in fact, "planted" by Officer Baars, we must be careful not to conflate that later acquired knowledge with the knowledge of the participants at the time (or in the subsequent months).

¶14 The referee, however, relied on his description of the April 15, 2014 events as the "planting" of evidence to form inferences about what the KPD officers and Attorney Zapf knew or should have known during the relevant time periods.

¶15 The state initiated separate criminal cases against Tibbs and Brantley related to the Edwards homicide. Attorney Zapf was the prosecuting attorney on those cases, which remained pending in the fall of 2014. Attorney Terry Rose represented

7

Tibbs. Attorney Christopher Glinski represented Brantley. The state also filed a separate criminal complaint against Tibbs for his involvement in the Shenanigan's robbery. Attorney Zapf was not involved in that case.

¶16 The jury trial in the case against Tibbs involving the Shenanigan's robbery commenced on October 28, 2014.[5] There is no dispute that while that trial was occurring, Officer Baars had at least two conversations with KPD Detective Jason Kenesie, who was one of the lead investigators for both the Shenanigan's robbery and the Edwards homicide. The stipulation in this case provided that during these conversations, Officer Baars told Detective Kenesie that he had "improperly placed" Tibbs' Illinois ID and possibly the .22 caliber bullet into the blue backpack that had been found during the April 15, 2014 search.

¶17 The referee acknowledged that the stipulation used the term "improperly placed." That term does not mean that Officer Baars admitted to Detective Kenesie in October 2014 that he had intentionally planted the ID and possibly the bullet. The referee, however, equated "improperly placed" with "planted." Having inferred that Officer Baars had admitted planting evidence, the referee inferred that Detective Kenesie should have immediately questioned Officer Baars as a suspect in the commission of a crime involving planting evidence.

---

[5] Officer Baars apparently was not subpoenaed for and did not testify in Tibbs' trial regarding the Shenanigan's robbery.

8

¶18 Neither Officer Baars nor Detective Kenesie testified at the evidentiary hearing in this disciplinary proceeding. Attached to the stipulation in this case, however, was an internal police report, dated January 15, 2015, prepared by Detective Kenesie, which we shall reference as "the Kenesie Report."[6] This is the only evidence in the record to support the statement in the stipulation regarding what Officer Baars told Detective Kenesie. The Kenesie Report paints a different picture than the referee's inference that Officer Baars had admitted planting evidence.

¶19 According to the Kenesie Report, Officer Baars initially told Detective Kenesie that "he had screwed up and made a mistake." Officer Baars stated that during the search he had discovered the blue backpack with the bullet inside and that at some point while reviewing the contents of the backpack, he had placed Tibbs' ID, which he still had with him from the day before, into the backpack. When he announced the discovery of the backpack, Detective Traxler advised him that the backpack, the bullet, and the ID were to be collected as evidence. Officer Baars acknowledged that he had allowed the ID to be collected as evidence even though he knew it was not originally in the backpack. When Detective Kenesie asked him, however, whether he had left the ID in the backpack on purpose or if he had wanted to plant it as evidence, Officer Baars responded that

---

[6] This report was not shared with Attorney Zapf until after the events that underlie this disciplinary case.

9

he had not and that it had been a mistake. The Kenesie Report further stated that while meeting with Detective Kenesie, Officer Baars was emotional and had tears in his eyes.

¶20 Detective Kenesie advised other KPD officers about Officer Baars' statements. Detective Kenesie and another detective then met again with Officer Baars. During that meeting the two detectives determined that Officer Baars needed to write a supplemental police report about his actions during the search.

¶21 Officer Baars prepared an initial draft of the supplemental report and gave it to Detective Kenesie. In this first draft, Officer Baars stated that during the search of the bedroom, he had emptied the contents of various bags onto a dresser or television to inspect the contents. At one point he located the blue backpack, which contained a smaller caliber round of ammunition. He then announced the find of the backpack with the bullet, which caused Detective Traxler and other officers to enter the bedroom. According to this first draft of the report, Officer Baars recalled that he gave one of the officers the ID, but he did not remember from where he had retrieved the ID before doing so. After Detective Traxler stated that the ID and the bullet should be collected as evidence, Officer Baars placed the ID and the bullet into the front pocket of the backpack and returned the backpack to the floor so Officer Pie could photograph the location of the backpack and its contents. In this first draft, Officer Baars acknowledged that he had not advised any of the other officers

10

that he had been in possession of the ID when he had entered the residence and that it had not been found in the backpack. This first draft did not indicate in any way that Officer Baars had also initially placed the bullet into the backpack.

¶22 According to the Kenesie Report and the stipulation, Detective Kenesie reviewed the initial draft and shared it with another officer. They both felt that it left more questions than it answered so Detective Kenesie directed Officer Baars to redo the report. Officer Baars prepared a second draft of the supplemental report. Detective Kenesie felt that this draft also lacked clarity, and he directed Officer Baars to prepare a third draft.

¶23 The third draft was dated November 11, 2014, and will be referenced as the "11/11/14 supplemental report." The stipulation states that this third draft "disclosed Baars['] planting the ID card but did not disclose planting a bullet." The third draft, however, never uses any form of the word "plant" and does not describe Officer Baars' actions in placing the ID into the backpack in any truly different way than the first two drafts. The third draft does say that Officer Baars found the bullet in the backpack and announced its discovery to other officers, who came into the room. It states that Officer Baars believes he then gave Tibbs' ID to Detective Traxler, who directed that the ID and the bullet should be collected as evidence. The 11/11/14 supplemental report then states, like the prior versions, that Officer Baars placed the bullet and the ID into the backpack and returned it to the place where he had

11

found it so that it could be photographed and taken into evidence.

¶24 According to the Kenesie Report, Detective Kenesie felt that the 11/11/14 supplemental report was still confusing, did not completely explain the facts, and contained the officer's opinions about why he took certain actions that should not be included in a police report. Nonetheless, Detective Kenesie and another detective determined that this third draft would be submitted as written. Detective Kenesie subsequently brought the report to the supervising officer, who signed it. Detective Kenesie intended to have Officer Baars sign the report later that day, but he was not on duty that day.

¶25 A few days later, Detective Kenesie met with Officer Baars for the purpose of having him sign the 11/11/14 supplemental report. Officer Baars was extremely distraught and told Detective Kenesie that he was questioning himself about the ID. He then asked Detective Kenesie, "What if the bullet is the real issue?" When Detective Kenesie asked Officer Baars to explain, he stated that while he was struggling with the situation, could not remember exactly what had happened, and had been having "false memories," he felt that he might have brought the bullet, as well as the ID card, into the residence on the day of the search. When asked about having "false memories," Officer Baars said that he had been remembering things that he knew had not happened and gave an example to Detective Kenesie. When Detective Kenesie directly asked Officer Baars if he had brought the bullet into the residence and placed it into the

12

backpack, Officer Baars responded that he had not and was not saying that he had. Officer Baars said that he remembered at some point having looked at a .22 caliber bullet and asking himself how such a small object could kill something. Nonetheless, although he said that he did not remember initially placing the bullet into the backpack, he was concerned that he might have done that. Officer Baars subsequently told Detective Kenesie that he would not sign the 11/11/14 supplemental report as it currently existed and that he wanted to rewrite it. Detective Kenesie decided that Officer Baars should not rewrite the report yet again. The 11/11/14 supplemental report was turned over to a police captain, apparently for inclusion in the police file.

¶26 Based on his belief that it was clear from the beginning that the ID and possibly the bullet had been planted by Officer Baars, the referee makes additional inferences regarding the preparation of the three drafts of the report. Although the stipulation specifically stated that Detective Kenesie had rejected the first two drafts of the supplemental report because they had "lacked clarity," the referee determines that a reading of those reports does not support that

13

conclusion.[7] He infers from the fact that Detective Kenesie assisted Officer Baars concerning the preparation of three different drafts of the report and the fact that Detective Kenesie failed to treat Officer Baars as a criminal suspect by reading him his Miranda[8] rights, that Detective Kenesie and other KPD officers were engaged in a "blatant attempt to control damage to the KPD regarding the crime of a criminal police officer who was acting during that crime as a KPD officer." The referee further draws a "strong inference" of a "cover-up of police wrongdoing" from the fact that the report was signed by a supervisor, but not by Officer Baars.

¶27 On January 9, 2015, Detective Kenesie and two other KPD supervisory officers requested a meeting with Attorney Zapf. The referee describes this meeting in his report as follows: "On 9 January 2015, KPD Officers Kenesie, Hagen and Larson told Attorney Zapf that KPD Officer Baars had planted an Illinois ID card and possibly a .22 caliber bullet as evidence during the

---

[7] Quoting the stipulation, the referee also states that Detective Kenesie initially rejected the third draft of the supplemental report because it did not mention the planting of the .22 caliber bullet. He seems to use this quotation as additional evidence that Detective Kenesie knew all along that the bullet had been planted. The quoted passage from the stipulation on which the referee relied for this finding, however, was merely describing the contents of the third draft; it was not purporting to say that Detective Kenesie rejected the third draft (i.e., the 11/11/14 supplemental report) or that the reason he did so was the failure to mention the "planting" of the bullet.

[8] Miranda v. Arizona, 384 U.S. 436 (1966).

execution of a search warrant in the Tibbs and Brantley homicide case."

¶28 The only evidence in the record regarding this meeting are Attorney Zapf's testimony and the stipulation. None of the KPD officers who attended the meeting testified at the evidentiary hearing in the disciplinary case. The stipulation states that the KPD officers informed Attorney Zapf that Officer Baars "had placed Tibbs' Illinois identification card into the blue backpack and possibly a .22 caliber bullet during the search of the 59th Street residence." The stipulation did not say that Officer Baars had intentionally "planted" the ID or the bullet. The "placing" of the items into the backpack could have been negligence, could have been a result of Officer Baars' uncertainty as to what to do after Detective Traxler had ordered the ID card to be collected as evidence, or it could have been an intentional planting. A statement that Attorney Zapf was told about one or more items being placed, however, does not demonstrate that Attorney Zapf knew for a fact that the items had been "planted." Indeed, Attorney Zapf testified that he was not told that Officer Baars had "planted" the ID card. Attorney Zapf further testified that he had been told at this meeting that Officer Baars had said that he had placed the ID into the backpack, but Officer Baars also indicated that the handling of the ID had been a mistake or an oversight. Attorney Zapf also specifically testified that he had been told during the January 9, 2015 meeting that Officer Baars had spoken of "false

15

memories" about the bullet, but had explicitly denied having placed the bullet into the backpack.

¶29 At the end of the January 9, 2015 meeting, Attorney Zapf directed the officers to provide him with a written report regarding what they had told him. The officers did not prepare their own report. On January 21, 2015, Detective Kenesie submitted Officer Baars' 11/11/14 supplemental report to Attorney Zapf's office. The referee infers further cover-up from the fact that the officers did not prepare their own report and that Attorney Zapf did not follow up when he did not receive such a report.

¶30 According to his testimony at the evidentiary hearing, on January 9, 2015, the Kenosha Chief of Police, John Morrissey, also learned for the first time[9] of the fact that Officer Baars had apparently mishandled evidence and placed Officer Baars on

---

[9] The referee finds the statement that the chief of police first learned of this situation on January 9, 2015, after returning from a vacation, to be incredible because he cannot believe that the chief of police would have been unaware for over two months that one of his officers had engaged in the criminal conduct of "planting" evidence. There is nothing in the record, however, to support an inference that Chief Morrissey had learned of "planting" evidence even as of January 9, 2015, or to support an inference that he had learned of any sort of mishandling of evidence by Officer Baars prior to January 9, 2015.

16

administrative leave pending the completion of an internal affairs investigation.[10]

¶31  On January 18, 2015, one day before an administrative hearing about his conduct, Officer Baars resigned from the Kenosha Police Department.  Chief Morrissey's testimony about the resignation is the sole source in the record of evidence about Officer Baars' resignation.  He testified that Officer Baars gave him a short note of resignation, which said only that he was resigning from the police department for "personal reasons."  Chief Morrissey further testified that when he asked Officer Baars whether his resignation was due to the search incident, Officer Baars refused to explain his reasons for resigning beyond referencing the "personal reasons" stated in his resignation note.

¶32  On January 19, 2015, Chief Morrissey met with Attorney Zapf.  Once again, the referee finds that "again [Attorney Zapf] was given information about the planting of evidence by KPD Officer Baars."  There is no evidence in the record, however, that Chief Morrissey gave Attorney Zapf any information about the "planting" of evidence.  The only evidence in the record

---

[10] In addition to the Kenesie Report that was completed on January 15, 2015, a different KPD officer conducted an internal affairs investigation pursuant to the police chief's directive and prepared an internal affairs report dated January 28, 2015. There is no dispute that neither the Kenesie Report nor the January 28, 2015 internal affairs report were provided to Attorney Zapf until after the events at issue in this disciplinary proceeding.

about the content of this meeting comes from the testimony of Chief Morrissey and Attorney Zapf. Chief Morrissey testified that he did not discuss the facts of the search with Attorney Zapf because he believed that his officers had done this during the January 9, 2015 meeting. Chief Morrissey did inform Attorney Zapf that Officer Baars had resigned and asked him for an opinion about whether Officer Baars could be charged with misconduct in office. According to Chief Morrissey, Attorney Zapf could not offer an opinion about the applicability of the misconduct in office statute because he had not yet received any report from the police department about what had occurred during the search. Chief Morrissey further testified that Attorney Zapf told him that, regardless of whether criminal charges ultimately could be issued against Officer Baars if the facts so dictated, Attorney Zapf would need a written report from the KPD, which would need to be provided to the defense attorneys for Tibbs (Attorney Rose) and Brantley (Attorney Glinski).

¶33 On January 21, 2015, Detective Kenesie did submit Officer Baars' 11/11/14 supplemental report to Attorney Zapf's office. As Attorney Zapf had been told during the January 9, 2015 meeting, the 11/11/14 supplemental report spoke of Officer Baars "placing" the ID card into the backpack. It did not say that Officer Baars had "planted" the ID card, and it said nothing about the bullet having been introduced into the backpack by Officer Baars. The referee calls the 11/11/14 supplemental report a "false and unauthorized" report. He infers that the submission of this "false" report by the KPD to

18

Attorney Zapf, with the expectation that it would be shared with defense counsel for Tibbs and Brantley, was part of the KPD's "intentional cover-up of evidence of police misconduct." The referee also adversely infers that Attorney Zapf was part of this cover-up because he should have known when he received this report that it was not "direct regarding the issue of planting evidence and [was] incomplete as to the resignation of [Officer Baars] from the KPD."

¶34 On January 26, 2015, Attorney Zapf sent identical letters to Attorney Rose and Attorney Glinski. The letters were copied to the judges for both the Tibbs (Judge Mary Wagner) and the Brantley (Judge Bruce Schroeder) criminal cases. The letters simply stated that enclosed with the letter was "additional miscellaneous discovery." The letter then listed six enclosed documents, one of which was the 11/11/14 supplemental report. Having already inferred that Attorney Zapf knew both that Officer Baars had planted evidence and that the 11/11/14 supplemental report was false and incomplete because it did not explicitly say so, the referee further inferred that the failure of Attorney Zapf to explain the significance of the 11/11/14 supplemental report was an intentional attempt to hide or downplay the evidence.

¶35 Attorney Glinski testified in this matter that he received the January 26, 2015 letter and the enclosed 11/11/14 supplemental report, but he did not understand the significance of the report. Attorney Rose claimed in his testimony that he never received the January 26, 2015 letter and that he never

19

checked the electronic docket for Tibbs' criminal case, which would have alerted him to the existence of that letter.

¶36 After the January 26, 2015 letter had been sent, Tibbs pled guilty to felony murder and agreed to testify against Brantley. Attorney Zapf then notified Attorney Glinski that Tibbs should be added to the state's witness list in the Brantley case.

¶37 On Monday, February 23, 2015, the Brantley trial commenced. A third co-defendant, Brandon Horak, testified that he had made arrangements for the purchase of marijuana from Edwards, but that the arrangements had been a setup by himself, Brantley and Tibbs to rob Edwards of the marijuana. On Thursday, February 26, 2015, Attorney Zapf called Officer Brandie Pie to testify. She testified that she had assisted in the collection of evidence during the April 15, 2014 search of the 59th Street home. Attorney Zapf did not ask about the backpack, the ID, or the bullet during his direct examination. On cross-examination, however, Attorney Glinski did ask about the collection of the backpack with the ID card and bullet inside. Tibbs also testified during the state's case earlier that day. When asked about the backpack, Tibbs denied that it belonged to him and denied any knowledge of a .22 caliber bullet.

¶38 Before closing arguments the following morning, Attorney Zapf advised Attorney Glinski and Judge Schroeder that there had been problems regarding the collection of the backpack, the ID and the bullet, and that Attorney Glinski

20

appeared to be operating under a misconception about those items.  He also advised defense counsel for the first time that Officer Baars had resigned.  The OLR alleged that the following statement by Attorney Zapf to the court during this discussion was false:

> What I would understand subsequently, although I don't have personal knowledge, and I don't have anything in documentation, that as a result of the misunderstanding or how those items got into the backpack or into evidence, Officer Baars resigned from the police department.  I don't know anything about discipline.  I don't know anything about prior history, but Officer Baars resigned as a result, in part, I would say, as a result of his handling or mishandling of evidence at the crime scene, or the shooting of the residence at 1208 59th Street (sic).

In his conclusions of law, the referee broke down this statement into a number of constituent parts that he found to be false. His findings will be addressed in the analysis of his legal conclusions below.

¶39 The referee does not include the following facts in his report, but they are acknowledged in the stipulation or are otherwise not contested.  After Attorney Zapf made his disclosure on the morning of the fifth day of the Brantley trial, he and Attorney Glinski jointly telephoned Officer Baars. During that call, for the first time Officer Baars admitted having brought both the ID card and the .22 caliber bullet to the scene of the search and planting them in the backpack.  He also admitted that his resignation had been "related partially to his investigation of this case [i.e., Brantley's case]." After the court learned of Officer Baars' admissions, it

21

recessed the trial so that defense counsel could review the KPD internal affairs report and Officer Baars' employment file and prepare for testimony by Officer Baars. When the Brantley trial resumed on March 2, 2015, Attorney Glinski called Officer Baars as a defense witness. Officer Baars testified that he had planted both the ID card and the .22 caliber bullet in the backpack, and that he had resigned from the KPD as a result of his actions during the execution of the search warrant. Attorney Zapf stipulated that the defense had not learned about Officer Baars having planted the .22 caliber bullet until the morning of February 27, 2015. Despite the jury hearing this evidence, it still found Brantley guilty as charged.

¶40 Brantley filed a postconviction motion seeking a new trial on the grounds that the prosecution had withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S 83 (1963). The circuit court denied the motion, finding that evidence that Officer Baars had planted an ID card and a .22 caliber bullet was not exculpatory, relevant, or a Brady violation.

¶41 As soon as Officer Baars had testified in the Brantley case (even before the jury returned its verdict), Attorney Zapf referred the matter to the Milwaukee County District Attorney's Office, which ultimately charged Officer Baars with felony misconduct in office. Officer Baars pled guilty to that charge and was convicted.

¶42 Tibbs also filed a postconviction motion asking for plea withdrawal. In response to the motion, Attorney Zapf

22

advised the court that Tibbs should be allowed to withdraw his guilty plea. After Attorney Rose conducted discovery and obtained the testimony of Attorney Zapf and various KPD officers, Tibbs withdrew his motion and allowed his conviction and sentence to stand.

## REFEREE'S LEGAL CONCLUSIONS

¶43 Based on the facts he found and the inferences he drew, the referee concluded that the OLR had proven the allegations in Count 1 and Count 3. He concluded that the OLR had not proven the allegations of a violation in Count 2.

**Count 1—Violation of Wis. Stat. § 971.23(1)(h) and SCR 20:8.4(f)**

¶44 Count 1 of the OLR's complaint alleged that Attorney Zapf had violated the Wisconsin criminal discovery statute, Wis. Stat. § 971.23(1)(h), as enforced via SCR 20:8.4(f). The discovery statute provides, in relevant part, as follows:

> (1) WHAT A DISTRICT ATTORNEY MUST DISCLOSE TO A DEFENDANT. Upon demand, the district attorney shall, within a reasonable time before trial, disclose to the defendant or his or her attorney and permit the defendant or his or her attorney to inspect and copy or photograph all of the following materials and information, if it is within the possession, custody or control of the state:
>
> * * *
>
> (h) Any exculpatory evidence.

¶45 The referee concluded that the OLR had proven by clear, satisfactory, and convincing evidence that Attorney Zapf

23

had violated the discovery statute "by failing to fully disclose information in his possession or otherwise available to him to the defense in both the Tibbs and Brantley homicide cases regarding former Officer Baars' misconduct in planting evidence at the scene of a homicide investigation, including the fact that Baars had resigned from the KPD because of his misconduct . . . ." The referee further concluded, although not explicitly, that the violation of the discovery statute, by itself, constituted a violation of SCR 20:8.4(f), which states that it is professional misconduct for a lawyer to "violate a statute, supreme court rule, supreme court order, or supreme court decision regulating the conduct of lawyers." The referee did not provide any analysis to support this conclusion of a violation of the ethical rule. He did not provide a distinct analysis of whether Attorney Zapf's failure to disclose was negligent or intentional. In other places in his report, however, the referee did state that he found Attorney Zapf's conduct to have been intentional.

**Count 2—Violation of SCR 20:3.4(b)**

¶46 The referee concluded that the OLR had not proven that Attorney Zapf's examination of Officer Brandie Pie had violated SCR 20:3.4(b), which states that a lawyer shall not "falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law."

¶47 The referee stated that the OLR's theory was that Attorney Zapf had failed to provide clarifying information at the end of the afternoon of the fourth day of trial when Officer

24

Pie testified on cross-examination by the defense that she had collected and photographed the backpack, the ID card, and the .22 caliber bullet. The referee concluded that Attorney Zapf's disclosure to defense counsel and the court the following morning before any further proceedings in the trial was a timely action to correct or complete the record regarding the location, collection, and identification of the ID card and the bullet. Referee Flynn noted that Attorney Zapf had not personally asked about those items. Thus, his disclosure the following morning was effectively the first time that he could correct the impression created by Officer Pie's testimony on cross-examination. The referee found that this disclosure satisfied Attorney Zapf's obligations under SCR 20:3.4(b).

**Count 3—Violation of SCR 20:3.3(a)(1)**

¶48 The referee concluded that the OLR had proven by clear, satisfactory, and convincing evidence that Attorney Zapf had violated SCR 20:3.3(a)(1)[11] by making false statements of fact to a tribunal in his disclosure to the trial court on the morning of Day 5 of the Brantley trial. The referee broke down Attorney Zapf's statement into a number of constituent assertions, the truthfulness of which he analyzed individually.

¶49 First, the referee characterizes Attorney Zapf's statement to the court as asserting that he had no personal

---

[11] SCR 20:3.3(a)(1) provides: "A lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."

25

knowledge about the entire episode involving Officer Baars. The referee states that the stipulation shows that Attorney Zapf did have personal knowledge about Officer Baars' conduct because, as the referee inferred, Attorney Zapf was told by the supervisory KDP officers in the January 9, 2015 meeting and by Chief Morrissey during the January 19, 2015 meeting that Officer Baars had planted evidence and that he had resigned because of the planting of evidence. Thus, the referee concludes that this assertion by Attorney Zapf, as the referee characterized it, was false.

¶50 Next, the referee characterizes Attorney Zapf's statement as claiming that he had no documentation about Officer Baars' actions. The referee acknowledges that Attorney Zapf had no written documentation other than the 11/11/14 supplemental report that he had provided to defense counsel, but the referee still labels this assertion, as he characterizes it, as being intentionally misleading and not truthful because Attorney Zapf did have oral reports from KPD officers about Officer Baars' misconduct.

¶51 Third, the referee characterizes Attorney Zapf's statement as having claimed that he did not know that Officer Baars had resigned because of his misconduct of planting evidence in the backpack. The referee concludes that this assertion was not truthful because Attorney Zapf "knew, as of 19 January 2015, that officer Baars had resigned and the theory that the resignation was related to the evidence planting misconduct was a reasonable inference even though Officer Baars

26

did not give Chief Morrissey any definitive statement of the reason for his resignation." In other words, the referee concludes this assertion of knowledge, as the referee characterizes it, was not truthful because Attorney Zapf <u>should have known</u> that it <u>was reasonable to infer</u> that Officer Baars had resigned because he had planted evidence.

¶52 Fourth, the referee reads Attorney Zapf's statement as including an assertion that he had no knowledge about any prior discipline being imposed on Officer Baars. The referee concludes that this assertion was truthful.

¶53 Fifth, the referee interprets Attorney Zapf's statement as including an assertion that he had no knowledge about "prior history." The referee does not view this as prior history about Officer Baars, but rather as saying that Attorney Zapf had no knowledge about the prior history of the evidence planting by Officer Baars. For the reasons noted above regarding the two meetings with KPD personnel, the referee finds this assertion, as he characterizes it, to be untrue.

¶54 Finally, the referee characterizes Attorney Zapf's statement as including an assertion that he had no opinion about the reason why Officer Baars had resigned. The referee does not find this to be false because it was an opinion rather than a statement of fact.

**REFEREE'S RECOMMENDATIONS AS TO SANCTIONS AND COSTS**

¶55 The OLR's complaint initially sought a 90-day suspension, and its counsel reaffirmed that request in his closing argument. Attorney Zapf's counsel did not make a

27

specific recommendation as to sanction, arguing at the conclusion of the evidentiary hearing that the OLR had failed to prove any of the three charged counts and therefore that the complaint should be dismissed in its entirety.

¶56 The referee, who clearly viewed this matter as a massive conspiracy by the KPD as well as an egregious exercise in hiding police criminal conduct by Attorney Zapf, recommended that the court suspend Attorney Zapf's license for "at least 1 year." The referee did not cite any prior disciplinary decisions as support for his recommendation. He did believe that the fact that Attorney Zapf had been disciplined in 1985 for also failing to disclose exculpatory evidence was a "disturbing" aggravating factor. The referee stated that he believed that Attorney Zapf's conduct had stemmed from "an effort to win regardless of the rights both sides in the matter have to fundamental fairness in the trial." Although the referee acknowledged earlier in his report that even at the time of Attorney Zapf's disclosure on Day 5 of the Brantley trial, Attorney Zapf did not know about the "cover-up" engaged in by the KPD (as the referee believes), he faults Attorney Zapf for failing to act as the "gatekeeper" to ensure that the defense knew about what had occurred in the planting of evidence by Officer Baars and the subsequent cover-up by the KPD. The referee further indicated that Attorney Zapf's untruthful statements to the court when he ultimately did disclose compounded the misconduct.

¶57 The referee recommended that the court impose two conditions on Attorney Zapf's reinstatement and resumption of the practice of law. First, the referee recommended that the court require Attorney Zapf to undergo 25 hours of continuing legal education that focused on the duties of a prosecutor. Second, the referee recommended that the court condition Attorney Zapf's license on never again acting as a prosecutor.

¶58 The referee also recommended that Attorney Zapf be ordered to pay the full costs of this disciplinary proceeding. The OLR's supplemental statement of costs indicates that the total costs of this case, through oral argument, were $17,937.79.

## ANALYSIS OF APPELLATE ARGUMENTS

**Count 1-Violation of Wis. Stat. § 971.23(1)(h) and SCR 20:8.4(f)**

¶59 This count alleges that Attorney Zapf violated SCR 20:8.4(f), which, among other things, makes it professional misconduct to violate a statute regulating the conduct of attorneys. In this instance, the statute regulating the conduct of attorneys that Attorney Zapf allegedly violated was the Wisconsin criminal discovery statute, Wis. Stat. § 971.23(1), the relevant text of which is set forth in paragraph 44 above.

¶60 Attorney Zapf's primary argument on appeal regarding Count 1 is that the OLR and the referee are expanding the scope of the ethical rules to require a prosecutor to disclose more than is required under Brady v. Maryland, 373 U.S. 83 (1963). Attorney Zapf asserts that this court rejected that the duty to

disclose was broader under the Wisconsin discovery statute than under Brady in In re Disciplinary Proceedings Against Riek, 2013 WI 81, 350 Wis. 2d 684, 834 N.W.2d 384. In that case, Sharon Riek, an assistant district attorney in Racine County, was assigned to prosecute a marijuana possession case against Tyrone Smith. Another passenger in Smith's vehicle, Isaiah Simpson, confessed at a revocation hearing for Smith that the marijuana in the vehicle had belonged to him, not Smith. Smith's defense counsel obviously was aware of Simpson's confession. Approximately one month later, Simpson met with District Attorney Michael Nieskes and again confessed that the marijuana at issue had belonged to him. District Attorney Nieskes wrote a very short note indicating that Simpson had said the marijuana was his. Assistant District Attorney Riek was aware of the conversation between District Attorney Nieskes and Simpson, but she testified that she was unaware of the note until later. Smith's counsel later learned that Simpson had spoken with District Attorney Nieskes, and he requested copies of any information Simpson had provided to the District Attorney's office. At that point, Assistant District Attorney Riek found the note from District Attorney Nieskes in a pile of papers on her desk and sent a copy of it to Smith's counsel.

¶61 The OLR charged Attorney Riek with violating both SCR 20:3.8(f)(1)[12] and Wis. Stat. § 971.23(1)(h), as enforced via

---

[12] SCR 20:3.8(f)(1) provides as follows:

(continued)

30

SCR 20:8.4(f). The OLR appealed the referee's recommendation that all counts be dismissed. It argued in this court that a prosecutor's disclosure obligations under SCR 20:3.8(f)(1) were broader than the disclosure obligations imposed by Brady and its progeny. This court rejected that argument. Riek, 350 Wis. 2d 684, ¶29 ("We reject the OLR's proffered interpretation of SCR 20:3.8(f)(1)."). The court further held that District Attorney Nieskes' note was not material under SCR 20:3.8(f)(1) because the defense already knew from the revocation hearing that Simpson had claimed ownership of the marijuana.

¶62 Based on the proposition that the discovery statute incorporates all of the elements outlined in Brady, including that the undisclosed evidence was material, Attorney Zapf argues that he did not violate the discovery statute here because the evidence was not material. He relies on the following facts to show the lack of materiality. He asserts that he was orally told in the January 9, 2015 meeting that an officer had inadvertently "mishandled evidence" during a search. The

---

(f) A prosecutor, other than a municipal prosecutor, in a criminal case or proceeding that could result in the deprivation of liberty shall:

(1) make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal; . . . .

31

mishandled evidence discussed at that time, however, was only the ID card, which Attorney Zapf concluded was not material because Tibbs' identity was not at issue in his case and therefore the ID had no bearing on his guilt or innocence. Attorney Zapf acknowledges that the supervisory officers also told him about Officer Baars' strange discussion of having false memories of possibly introducing a bullet to the search location, but he emphasizes that the officers said Officer Baars expressly denied having planted the bullet. Moreover, Attorney Zapf says that he reasonably concluded that any information about a .22 caliber bullet was not material since the weapon used to kill Edwards had been a .32 caliber handgun.

¶63 Attorney Zapf also argues that the proceedings in the two criminal cases following his disclosure prove that the disclosure of neither piece of evidence was material. In Brantley's case, the jury heard Officer Baars confess to planting both the ID card and the bullet, but the jurors still found Brantley guilty. Thus, the lack of disclosure clearly did not affect the outcome of that trial. Similarly, after conducting discovery, Tibbs withdrew his motion to rescind his guilty plea, which, according to Attorney Zapf, shows that Tibbs concluded that Officer Baars' confession would not change the outcome of his case.

¶64 In response, the OLR starts from the premise that Officer Baars engaged in "criminal actions" that constituted

"serious police misconduct."[13]  From that basis, it argues that, of course, the defense should have been made aware of the information.

¶65 The OLR faults Attorney Zapf for focusing only on the specific pieces of evidence——the ID card and the .22 caliber bullet——and failing to acknowledge that the act of planting evidence, by itself and regardless of what items were planted, was exculpatory information that should have been disclosed.  It points out that the referee properly took this wider view of what should have been disclosed.  Noting that Referee Flynn previously served as a circuit court judge, it argues that his determination that "police misconduct" always constitutes exculpatory evidence per se that should be disclosed "should be given great deference."

¶66 The OLR then proceeds to distinguish the Riek decision.  It points out that in Riek, unlike in the present case, the defense was already aware of the exculpatory information (Simpson's confession of owning the marijuana), and what was not disclosed (District Attorney Nieskes' note) was duplicative.  On the other hand, according to the OLR, what was disclosed by Attorney Zapf (namely, the 11/11/14 supplemental

---

[13] The OLR's brief does not distinguish between what Officer Baars ultimately admitted to doing (i.e., planting evidence) and what he initially told Detective Kenesie that he had done, which was making a mistake in allowing Detective Traxler to have a wrong impression of the source of the ID and in allowing the ID to be collected as evidence in connection with the backpack.

report) was vague and could not be understood without knowing the background of Officer Baars' discussion with his superior officers, which Attorney Zapf did not disclose until Day 5 of the Brantley trial. The OLR argues that the undisclosed information here, Officer Baars' planting of evidence, was not duplicative of information the defense already knew nor was it irrelevant. It points to the testimony of both Attorney Rose and Attorney Glinski that this information would have been important to them and would have altered their strategies in representing their respective clients.

¶67 Neither party's analysis of this count is on the money. First, Attorney Zapf reads our decision in Riek too broadly. When we said in that case that a prosecutor's obligation to disclose was limited to the contours of Brady and its progeny, we were interpreting only a prosecutor's obligation under SCR 20:3.8(f)(1). Riek, 350 Wis. 2d 684, ¶¶25-36. We did not hold in that case that a prosecutor's obligation under the Wisconsin discovery statute, as enforced via SCR 20:8.4(f), was entirely congruent with the obligation as set forth in Brady.

¶68 Indeed, in a case cited in neither party's brief in this court, a fact that is of some moment, as explained below, we specifically acknowledged that there are certain differences between the Wisconsin criminal discovery statute and Brady. See State v. Harris, 2004 WI 64, 272 Wis. 2d 80, 680 N.W.2d 737. In that case the prosecution did not disclose until after Harris had pled guilty that the victim, B.M.M., only several weeks before making allegations against Harris, had made an allegation

34

that her grandfather had sexually assaulted her on two occasions by touching her in a manner similar to the manner she claimed Harris had followed. This court characterized this information as exculpatory impeachment evidence and ruled that the failure to disclose this exculpatory impeachment evidence did not violate Harris's constitutional rights under Brady because the United States Supreme Court in United States v. Ruiz, 536 U.S. 622, 633 (2002), had held that there is no constitutional right of a defendant to receive impeachment evidence, even if exculpatory, prior to entry of a plea bargain. See Harris, 272 Wis. 2d 80, ¶23.

¶69 We did not, however, rule that the same analysis applied to the claim that the prosecution had violated the criminal discovery statute. We concluded that the analysis under the discovery statute was somewhat different because of the wording of the statute, although we did use the Brady framework for parts of the analysis. In particular, we said that "§ 971.23(1)(h) requires, at a minimum, that the prosecutor disclose evidence that is favorable to the accused if nondisclosure of the evidence undermines confidence in the outcome of the proceeding." Id., ¶27. With respect to the specific evidence that had not been disclosed, we concluded that although the evidence did not have to be disclosed pursuant to Brady because Harris had pled guilty, the exculpatory impeachment evidence should have been disclosed under the Wisconsin discovery statute because the evidence cast doubt on the credibility of the victim, who was the state's primary

35

witness, and the lack of disclosure undermined our confidence in the outcome of Harris's criminal case, given the circuit court's acceptance of Harris's offer of proof that he would not have pled guilty if he had known the undisclosed evidence.

¶70 In addition, in Harris we also considered the difference in timing under Brady versus under the Wisconsin discovery statute. While Brady is not violated if there is delayed disclosure, even during a trial, so long as the disclosure comes soon enough to allow the defense to use the information, the discovery statute requires disclosure "within a reasonable time before trial." Thus, this court ruled that Brady's timing requirement could not be imported into the statutory analysis because the statute imposed a broader obligation than the United States Constitution. Harris, 272 Wis. 2d. 80, ¶37. We concluded that the statute required exculpatory evidence to be disclosed sufficiently prior to trial such that there remains "sufficient time for its effective use" at trial, even if the defendant ultimately pleads guilty. Where Harris had pled guilty two weeks prior to his scheduled trial date, this court concluded that disclosure had been required prior to the date of his plea because he could not have effectively used the information at trial if disclosure occurred after that point. Id., ¶38.

¶71 We need not and do not decide in this case the full and precise ways in which the contours of Brady and Wisconsin's discovery statute either overlap or diverge. We are not reviewing either Mr. Tibbs' criminal conviction or Mr.

36

Brantley's. What we are determining is whether the OLR has proven by clear, satisfactory, and convincing evidence that Attorney Zapf engaged in professional misconduct by violating SCR 20:8.4(f). Thus, unlike in a criminal case, where the focus is on the information and materials in the state's possession, we must focus on what information or materials Attorney Zapf had in his possession. We conclude for multiple reasons that Attorney Zapf did not violate SCR 20:8.4(f).

¶72 First, we consider whether Attorney Zapf should have disclosed the fact that, as he alleges he understood the situation at the time, Officer Baars had made a mistake in placing the ID card into the backpack once he had given it to Detective Traxler and the detective, operating under that misimpression, had ordered that the ID card be photographed and collected as evidence.

¶73 We begin with the words of the section of the discovery statute that the OLR alleges Attorney Zapf violated. Boiled to its essence, the statute requires district attorneys to disclose to criminal defendants or their attorneys, within a reasonable time prior to trial, information or materials that are within the possession, custody or control of the state and that qualify as "exculpatory evidence." In Harris, we defined exculpatory evidence as evidence "that is favorable to the accused if nondisclosure of the evidence undermines confidence in the outcome of the proceeding." Harris, 272 Wis. 2d 80, ¶27.

¶74 We have no difficulty concluding that the mere placement of the ID card into the backpack, if done by Officer

37

Baars through a mistake or even with negligence, was not exculpatory evidence the nondisclosure of which undermines our confidence in the outcome of either Tibbs' or Brantley's criminal case. The ID belonged to Tibbs so it had no bearing on Brantley's case. It also was not exculpatory as to Tibbs because, as Attorney Zapf points out, there was no question of Tibbs' identity in the case alleging his involvement in the homicide of Edwards. Thus, Attorney Zapf could not have violated the discovery statute, thereby also violating SCR 20:8.4(f), by failing to disclose that Officer Baars had "placed" the ID card into the backpack. In any event, Attorney Zapf did disclose that fact when he sent the 11/11/14 supplemental report to defense counsel and the two circuit courts because that report specifically said that Officer Baars had "placed" the ID card into the backpack.

¶75 What about the bullet? Until Officer Baars admitted that he had planted the bullet during his telephone conversation on the fifth day of the Brantley trial, there is no evidence that supports a finding of fact that Attorney Zapf knew that Officer Baars had "placed" the bullet into the backpack. Even the referee acknowledges that at most Attorney Zapf was told that Officer Baars had "possibly" introduced the bullet into the backpack. Even if Attorney Zapf had been clearly told that Officer Baars had definitely introduced the bullet into the backpack, through a mistake or through negligence, the analysis would be the same as for the ID card. The bullet that killed Edwards was a .32 caliber bullet. The gun that fired that

38

bullet was recovered from the residence on 59th Street the day before the search in which Officer Baars was involved. Thus, the presence of a .22 caliber bullet had no relevance to Tibbs' or Brantley's involvement in Edwards' homicide, and the failure to disclose the introduction of that bullet does not undermine in any way our confidence in Tibbs' conviction following the entry of his guilty plea or in Brantley's conviction following his trial.

¶76 The OLR, however, focuses on the referee's findings that the relevant figures in the KPD knew that Officer Baars had "planted" the ID card (and possibly the bullet) and that Attorney Zapf knew or should have known that same fact from his interactions with them (his meeting with the officers on January 9, 2015, his meeting with Chief Morrissey on January 19, 2015, and his receipt of the allegedly false and incomplete 11/11/14 supplemental report). The OLR argues that, whether or not the ID card and the bullet themselves were exculpatory, the fact that the ID card (and possibly the bullet) had been planted was exculpatory because it would have allowed the defense to argue to a jury that the police investigation had been tainted.

¶77 The answer to this argument is that we are deciding whether Attorney Zapf, not the state, violated SCR 20:8.4(f) by personally violating the discovery statute. In Riek, we concluded that in order for a district attorney to be found to have violated his/her obligations to disclose evidence under SCR 20:3.8(f)(1), the OLR must prove by clear, satisfactory, and convincing evidence not only that the attorney failed to

39

disclose evidence that should have been disclosed under applicable law, but also that the attorney's failure to disclose was more than carelessness or negligence on the part of the attorney. Riek, 350 Wis. 2d 684, ¶45.

¶78 In this case, the OLR failed to prove that Attorney Zapf's conduct met both of those standards. First, to the extent that the referee infers that Attorney Zapf had actual knowledge that Officer Baars had intentionally planted evidence at some point prior to Officer Baars' admission of that fact, we determine that any such finding is clearly erroneous. The referee does make statements that could be considered findings of fact that during the January 9, 2015 meeting, Detective Kenesie and the other KPD officers told Attorney Zapf that Officer Baars had "planted" the ID card (and possibly the bullet). There is, however, no place in the record where this statement is made. As noted above, none of the police officers involved in that meeting testified at the evidentiary hearing in this case. The only participant in the meeting who did testify was Attorney Zapf, and he did not say that he had been told that Officer Baars had "planted" evidence. He testified that the officers said that Officer Baars had spoken of making a "mistake," had denied planting the ID card, and had made confusing statements about having had "false memories" of possibly having brought the bullet to the scene of the search.

¶79 As the trier of fact, the referee was entitled to accept or reject Attorney Zapf's denial of having been told that the ID had been planted, but the only way that the referee could

40

have found that the KPD officers told Attorney Zapf during the January 9, 2015 meeting that the ID card had been "planted" by Officer Baars was to infer that fact. Such an inference, however, must be a reasonable one based on the evidence. It cannot simply be the referee's speculation.

¶80 The problem with the referee's inference that Attorney Zapf had actual knowledge of the planting of evidence is that there is no evidence on which it can be reasonably based. The only way that the referee appears to have been able to reach that inference was to stack it on top of a long series of underlying inferences regarding what Officer Baars communicated to Detective Kenesie, what Detective Kenesie and other KPD officers knew based on Officer Baars' statements, what Chief Morrissey knew of Officer Baars' conduct, and what Detective Kenesie and others did to "falsify evidence" and to "cover-up" Officer Baars' "planting" of evidence. Although we have questions about these inferences by the referee as they relate to the actions of the police department, we need not definitively determine whether those inferences are clearly erroneous. Even if the KPD had knowledge that Officer Baars had done something more than just made a mistake, to make the ultimate inference that Attorney Zapf also learned that fact from Detective Kenesie at the January 9, 2015 meeting there would have to be some basis in the record to make that inference reasonable. There simply is no basis in this record to jump to that conclusion, so any finding to that effect is clearly erroneous.

41

¶81 The referee also asserts that Attorney Zapf should have known from what was communicated to him and from the incomplete nature of the 11/11/14 supplemental report that Officer Baars had "planted" the evidence and that he therefore had an obligation under the discovery statute to disclose that information to counsel for Tibbs and Brantley. The referee, however, acknowledges that Attorney Zapf had no knowledge at the time of what the referee, in hindsight, infers was manipulation of reports, lying, evidence falsification, and a cover-up by the KPD. An assertion that Attorney Zapf should have drawn the same inferences as the referee did at a later time with information that was not available to Attorney Zapf does not constitute clear, satisfactory, and convincing evidence of an ethical violation by Attorney Zapf.

¶82 The referee also faults Attorney Zapf for basing his analysis of whether he was required to disclose the introduction of the ID (and possibly the bullet) into the backpack on the materiality of those items to the prosecution of Tibbs and Brantley under Brady. As we have just determined, however, one cannot on this record make a finding that Attorney Zapf had actual knowledge that the ID card (and possibly the bullet) had been "planted." In the absence of knowledge of "planting," the analysis becomes much more complex, especially where the charge in this case is that Attorney Zapf violated the discovery statute. We note that neither the referee nor the OLR acknowledged the case law which holds that there are differences in analysis under the discovery statute and Brady. The referee

42

and the OLR, however, urge us to discipline Attorney Zapf for failing to conduct a legal analysis that they also did not fully make. There is simply no evidence to suggest that Attorney Zapf's analysis in the midst of the prosecution, to the extent it might have been erroneous, was the product of something more than negligence or carelessness. See Riek, 350 Wis. 2d 684, ¶45. For that additional reason, the OLR also cannot meet the clear, satisfactory, and convincing standard for demonstrating a violation of SCR 20:8.4(f). Accordingly, Count 1 must be dismissed.

**Count 2—Violation of SCR 20:3.4(b)**

¶83 The OLR does not appeal from the referee's conclusion that it failed to demonstrate a violation of SCR 20:3.4(b) in connection with Officer Pie's testimony. We agree with the referee's conclusion that this count should be dismissed. There is no evidence in this record that, even if Officer Pie gave false testimony, Attorney Zapf ever counseled or assisted her to do so. Attorney Zapf never asked her any questions about the backpack, the ID card, or the .22 caliber bullet. To the extent that Officer Pie answered questions about those items on cross-examination that might have contributed to defense counsel having an inaccurate understanding of how those items had been found, Attorney Zapf took steps as soon as practicable to correct any misimpression defense counsel or the court may have had.

43

**Count 3—Violation of SCR 20:3.3(a)(1)**

¶84 Attorney Zapf's argument on appeal regarding this count is simply that the referee's finding of a violation was based on an erroneous reading of certain of the factual assertions in his statement to the court on Day 5 of the Brantley trial and an erroneous belief regarding what Attorney Zapf knew at the time. We agree that the referee's findings that certain of Attorney Zapf's statements were false were based on a mischaracterization of what Attorney Zapf actually said. Quite simply, Attorney Zapf did not make most of the factual statements that the referee found he did. As to what he did say, it would be clearly erroneous to find that those statements were false.

¶85 To understand how the referee's characterization of Attorney Zapf's statements in court or the false natures of those statements were clearly erroneous, it is helpful to set forth again what he actually said:

> What I would understand subsequently, although I don't have personal knowledge, and I don't have anything in documentation, that as a result of the misunderstanding or how those items got into the backpack or into evidence, Officer Baars resigned from the police department. I don't know anything about discipline. I don't know anything about prior history, but Officer Baars resigned as a result, in part, I would say, as a result of his handling or mishandling of evidence at the crime scene, or the shooting of the residence at 1208 59th Street (sic).

¶86 First, the referee asserts that Attorney Zapf falsely told the court that he had no personal knowledge about the entire episode involving Officer Baars. That is not what

44

Attorney Zapf said. He stated that he had no personal knowledge "that as a result of the misunderstanding or how those items got into the backpack or into evidence, Officer Baars resigned from the police department." His claim of a lack of personal knowledge related to the reasons for Officer Baars' resignation, not to the episode as a whole. The referee's finding of a falsity in this regard is therefore clearly erroneous.

¶87 Second, the referee found that Attorney Zapf had claimed in the statement that he had no documentation about Officers Baars' actions. Again, that is not what Attorney Zapf said. As with his lack of personal knowledge, the lack of documentation referenced in the statement related to the reasons for Officer Baars' resignation from the police department, not to his conduct during the search or during the preparation of the drafts of the supplemental report. The referee does not find that Attorney Zapf did, in fact, have documentation in his possession as to the reasons for Officer Baars' resignation. This claimed falsity is therefore also clearly erroneous.

¶88 Third, the referee does track what Attorney Zapf said by asserting that his statement that he had no personal knowledge that Officer Baars had resigned because of his misconduct in planting evidence was untruthful. The referee found this statement to be false because Attorney Zapf "knew" that Officer Baars had resigned and the theory that the resignation was due to the planting of evidence was a reasonable one. Attorney Zapf, however, did not say to the court, that he did not have personal knowledge of the fact of Officer Baars'

45

resignation so that cannot have been a false statement. He also did not say to the court that the theory about the resignation being due to the planting of evidence was an unreasonable one. What Attorney Zapf said is that he did not have personal knowledge as to whether that was the reason for Officer Baars' resignation. The referee did not find that Attorney Zapf actually had such personal knowledge. Therefore the finding of a false statement in this regard is clearly erroneous.

¶89 Finally, the referee found that Attorney Zapf falsely asserted that he had no knowledge about the prior history of Officer Baars' planting of evidence during the April 15, 2014 search. Again, that is not what Attorney Zapf said. He said that he "didn't know anything about discipline" and then immediately followed that statement by saying that he "didn't know anything about prior history." It is clear from this context that Attorney Zapf's statement about a lack of knowledge about "prior history" related to a lack of knowledge about prior history of discipline. Attorney Zapf did not say he had no knowledge at all about the April 15, 2014 execution of the search warrant or Officer Baars' subsequent conduct in this case. Since the referee did not find that Attorney Zapf did, in fact, have knowledge about "prior history" of discipline imposed on Officer Baars, and the OLR has not shown by clear, satisfactory, and convincing evidence that Attorney Zapf did have such knowledge of "prior history," the referee's finding of falsity in this regard was also clearly erroneous.

¶90 When one parses what Attorney Zapf said to the court, there is no basis on which to say that the OLR has demonstrated by clear, satisfactory, and convincing evidence that his statements constituted false statements of fact to a tribunal. Accordingly, Count 3 must be dismissed.

¶91 Having determined that the OLR failed to meet its burden to prove each of the three counts, we conclude that the disciplinary complaint against Attorney Zapf must be dismissed. In light of the complete dismissal of the complaint, we do not require Attorney Zapf to pay any of the costs of this proceeding.

¶92 IT IS ORDERED that the disciplinary complaint against Robert Zapf is dismissed.

¶93 IT IS FURTHER ORDERED that no costs will be imposed.