# COURT OF APPEALS
## DECISION
## DATED AND FILED

## December 18, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing.  If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.  *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2018AP1607-CR**

Cir. Ct. No.  2014CF450

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

JOSEPH-JAMAL R. BRANTLEY,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Kenosha County:  BRUCE E. SCHROEDER, Judge.  *Affirmed*.

Before Neubauer, C.J., Reilly, P.J., and Gundrum, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  Joseph-Jamal Brantley appeals from a judgment convicting him after a jury found him guilty of party to a crime (PTAC) first-degree reckless homicide with a dangerous weapon, PTAC first-degree recklessly endangering safety with a dangerous weapon, PTAC armed robbery, and carrying a concealed weapon.  He also appeals from an order denying his motion for postconviction relief, in which he alleged a ***Brady***[1] violation and prosecutorial misconduct against then Kenosha County District Attorney Robert Zapf.  His arguments are unpersuasive.  We affirm.

## I. Facts

¶2    In April 2014, on behalf of Brantley and Markese Tibbs, Brandon Horak arranged a marijuana "buy" from Anthony Edwards through Edwards' cousin, Jacob Lang.  Horak believed Brantley's and Tibbs' true plan was to rob Edwards.  Brantley and Tibbs approached Edwards in his vehicle.  Someone demanded that Edwards surrender the bag of marijuana he had on his lap.  Tibbs later testified that Brantley snatched it and Edwards began to drive off.  One of the men shot at him.  A bullet punctured Edwards' lung; he died shortly after.

¶3    The ensuing investigation implicated Brantley and Tibbs in the robbery and murder.  While executing a search warrant over two days at the house where they were arrested, police found a .22-caliber bullet and Tibbs' Illinois identification card in a backpack and a .32-caliber, not .22-caliber, revolver above a ceiling tile.  Brantley later was determined to be a "possible contributor" to the

---

[1]   *See* ***Brady v. Maryland***, 373 U.S. 83 (1963).

three-person DNA mixture found on the gun. Tibbs was excluded. A .32-caliber bullet matching the revolver was recovered from Edwards' body.

¶4   A six-day jury trial commenced on Monday, February 23, 2015. At the start of trial on Day 5, Friday, February 27, Zapf advised the defense and the court of the misconduct of a Kenosha Police Department (KPD) officer involved in the investigation, Officer Kyle Baars. The parties agreed to stipulate that the defense was not informed until the morning of Day 5 that Baars had planted Tibbs' ID card and a .22-caliber bullet into the backpack, which was then placed into evidence. The court immediately adjourned the trial to allow the defense to examine the new information.

¶5   On Day 6, the following Monday, March 2, Brantley called Baars as a witness. Baars testified that he came into possession of Tibbs' ID card sometime during either Tibbs' transport to the police station or his booking, and pocketed it. He admitted that when he returned the next day to assist in a second police search of the house where Tibbs and Brantley had been arrested, he planted the ID card and the .22-caliber bullet—actually taken from his own residence—in a backpack, told fellow officers that he discovered them there, and allowed the items to be photographed and collected as evidence. Baars admitted that he resigned because of the misconduct. He also testified that he had no dealings with Brantley during the course of the investigation. The defense then rested.

¶6   Brantley moved to dismiss alleging "outrageous government conduct" based on Baars' testimony and the fact that the prosecution had not brought it to the defense's attention until nearly the end of trial. Observing that outrageousness should be judged by an entire governmental reaction, not by the "errant behavior of a rogue police officer," the court took Brantley's motion to

dismiss under advisement pending the jury's verdict. Before the court instructed the jury, Zapf informed them of the parties' stipulation. The jury found Brantley guilty on all counts.

¶7 Post verdict, Brantley moved for judgments of acquittal notwithstanding the verdict based on outrageous government conduct or, in the alternative, for a new trial, contending Zapf's failure to timely disclose Baars' misconduct and resignation was a ***Brady*** violation.

¶8 Brantley argued that KPD's late disclosure, and Zapf's subsequent failure to share the evidence until Day 5 of trial, was "outrageous." After an evidentiary hearing, the court disagreed. It found that the jury ultimately had a chance to consider the impact of Baars' actions, which it deemed irrelevant and not exculpatory vis-à-vis Brantley, and that it could not see how earlier disclosure would have altered anything. Concluding there was no ***Brady*** violation, the court denied the motion after the April 27, 2015 hearing.

¶9 On January 31, 2018, Brantley moved for postconviction relief seeking reversal of his conviction and forty-year sentence, asserting the pretrial failure to disclose the Baars information was a ***Brady*** violation and constituted prosecutorial misconduct.

¶10 In his motion, Brantley pointed to post-trial disciplinary proceedings, namely the Office of Lawyer Regulation's (OLR) three-count complaint against Zapf stemming from Brantley's case. It alleged violations of SCR 20:3.3(a)(1), SCR 20:3.4(b), and SCR 20:8.4(f), and WIS. STAT.

§ 971.23(1)(h) (2017-18), the criminal discovery statute.[2] The referee concluded that the OLR proved the allegations in two counts. *Office of Lawyer Regulation v. Zapf*, 2019 WI 83, ¶1, 388 Wis. 2d 1, 930 N.W.2d 202. As will be discussed below, the supreme court ultimately disagreed that any violations had been established and dismissed the complaint, both after the circuit court's ruling on Brantley's postconviction motion and briefing in this appeal. *Id.*, ¶2.[3]

¶11 The court denied Brantley's motion. It found that, even had the prosecution disclosed Baars' evidence-planting to the defense before trial, the bullet and ID card evidence was irrelevant as to Brantley and exculpatory only to Tibbs; indeed, the .22-caliber bullet was wholly irrelevant because Edwards was shot with a .32-caliber bullet. It further found that, as the matter was fully disclosed at trial, albeit near the end, the jury heard Baars admit his misconduct and resignation under oath. The court concluded there was no basis for Brantley's claim of taint of the entire investigation and prosecution and that he did not establish a reasonable probability of a different outcome. Brantley appeals.

## II. *Brady* Violation

¶12 Brantley first argues that KPD's and Zapf's failure to promptly disclose serious police misconduct violated his right to due process because the inability to present evidence of the cover-up undermined his constitutional right to

---

[2] All references to the Wisconsin Statutes are to the 2017-18 version unless noted.

[3] Appellate briefing was complete on April 18, 2019; the supreme court filed its decision on July 10, 2019. The parties' briefing thus was not based on the supreme court's decision and neither party requested to supplement their brief after the supreme court's decision. We therefore largely address the parties' arguments as set forth in their briefs, making note of the supreme court's conclusions where appropriate.

a fair trial. He also alleges a violation of WIS. STAT. § 971.23(1)(h), which mandates that the district attorney shall disclose to the defense any exculpatory evidence within a reasonable time before trial.

¶13    "[T]he defense has a constitutional right to all material exculpatory evidence in the hands of the prosecutor." *State v. DelReal*, 225 Wis. 2d 565, 570, 593 N.W.2d 461 (Ct. App. 1999); *see also Brady*, 373 U.S. at 86. The prosecutor has a duty to disclose such evidence even absent a formal request by the accused and encompasses impeachment evidence and evidence "known only to police investigators and not to the prosecutor." *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999) (citation omitted). Thus, to comply with *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

¶14    To establish a *Brady* violation, a defendant must show that: (1) the State suppressed the evidence in question; (2) the evidence was favorable to the defendant, either because it was exculpatory or impeaching; and (3) the evidence was material to the determination of the defendant's guilt or punishment. *Strickler*, 527 U.S. at 280. Evidence is not material under *Brady* "unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281.

¶15    Whether the State violated a defendant's right to due process under *Brady* is a question of constitutional fact that we review independently, *see DelReal*, 225 Wis. 2d at 571, but we review the underlying historical facts of the case using the clearly erroneous test, *State v. Sturgeon*, 231 Wis. 2d 487, 496, 605

N.W.2d 589 (Ct. App. 1999). We also apply the clearly erroneous test to the trial court's finding that the result of the trial would not have been different. *State v. O'Brien*, 223 Wis. 2d 303, 322, 588 N.W.2d 8 (1999).

¶16 Brantley's argument that the State violated the first *Brady* prong by suppressing the Baars evidence fails. While the disclosure was not made until the morning of Day 5, a Friday, the court adjourned the trial early that day to give Brantley time to assess the evidence, issue subpoenas, and tailor its defense if necessary. The jury heard Baars' full sworn testimony on the following Monday.

¶17 Brantley's argument also fails the second prong. The court's finding that the Baars evidence was not exculpatory of Brantley is not clearly erroneous. The ID belonged to Tibbs, so it had no bearing on Brantley's defense, and identification of Tibbs as involved in the homicide of Edwards was not an issue. The bullet that killed Edwards was a .32 caliber bullet, and the gun that fired that bullet was recovered the day before the search in which Baars was involved.

¶18 As to the third prong, Brantley did not establish that KPD's and Zapf's late disclosure of the evidence impacted the integrity of the investigation as to him. The court thus reasonably concluded that the evidence was not material, as there was no reasonable probability that, had the evidence been disclosed earlier, the result of the proceeding would have been different.

¶19 Brantley disagrees. He argues that in assessing materiality, the question is not whether he more likely than not would have received a different verdict with the evidence, but whether without it he received a fair trial, one resulting in a verdict worthy of confidence. *See Kyles*, 514 U.S. at 434. He argues the delayed disclosure denied him a fair trial, as the evidence was not produced in time for its effective use. *See State v. Harris*, 2008 WI 15, ¶63, 307 Wis. 2d 555,

745 N.W.2d 397. Specifically, he contends he was foreclosed from: gathering facts and fully developing arguments about Baars' conduct and what others, like KPD, did in response to it; altering his opening statement and examination of witnesses; better attacking the testimony of Tibbs, who testified for the State; and arguing to the jury that Zapf's and KPD's intentional cover-up significantly impeached the integrity of the entire prosecution.

¶20    Yet, we conclude that the late-disclosed evidence was not material as to Brantley, as the State provided compelling evidence of his guilt.

¶21    Horak testified to the following. Tibbs asked him, in Brantley's presence, to "set up a stain," which Horak knew to be a robbery. Horak arranged the "buy" with Lang. Brantley put a revolver in his jacket pocket when he and Tibbs left the house. A few minutes later Horak heard a "crack" and saw Brantley and Tibbs return to the house then soon emerge from a bedroom. Horak saw the gun on the bed and marijuana on a scale. A few minutes later Lang, Edwards' passenger, texted Horak that "you literally just killed my cousin." Horak told Brantley, "I think you just killed that man," and Brantley replied, "No. I shot, and I saw a spark, but there is no way I hit him." Horak declined Brantley's offer of $130 if he agreed not to go to the police.

¶22    Edwards was shot and killed by a .32-caliber bullet. Footprints in freshly fallen snow led police to the house where Brantley stayed. A .32-caliber revolver bearing Brantley's DNA was found above a ceiling tile in a bedroom.

¶23    Brandie Pie, the KPD evidence officer on the scene at the house, photographed a pair of jeans. The bottoms of the pant legs were wet and there was $130 in the pockets.

¶24 Edwards' passenger, Lang, described two suspects to police and said he saw the heavy-set one argue with Edwards, pull out a gun, and shoot him. Lang later tentatively identified them in photo arrays as Brantley and Tibbs, Brantley being the heavy-set one. He positively identified Brantley later, on seeing him in court at a hearing.

¶25 Another person present at the house throughout the day testified that Brantley and Tibbs planned the robbery in his presence and that, after they returned, he saw marijuana on a scale in the bedroom.

¶26 Tibbs, who by this time had pled no contest, testified to the following. Horak volunteered to find a marijuana seller because they were out of it. Tibbs and Brantley agreed to go in halves on it but he, Tibbs, did not know the cost or amount, although "[e]verybody kind of knew" a robbery would be committed. At Edwards' car, Brantley began arguing with Edwards about the quality of the marijuana; another car approached so Tibbs and Brantley began walking away in opposite directions. When the car was out of sight, he and Brantley returned to Edwards' car. Brantley said he had no money to purchase the marijuana. In Tibbs' "peripheral vision," he saw Brantley pull out a gun, put it to Edwards' head and say, "Let me get that," then take the bag of marijuana from Edwards' lap. As Tibbs began walking away, he heard the car pull away and the gunshot. He and Brantley fled. Once back at the house, Brantley changed his clothes. When Horak came into the bedroom and told them about Lang's text, Brantley admitted shooting toward the car.

¶27 Brantley argues that Zapf delayed disclosure because Tibbs was a necessary cog in the conviction wheel. He contends the Baars evidence, if timely disclosed, could have both dissuaded Tibbs from testifying for the State, thus

9

jeopardizing the State's case against Brantley, and persuaded Tibbs to take his own case to trial on a theory of a possibly corrupt investigation. Brantley suggests that Zapf had an interest in Tibbs' case because he was the prosecutor there as well. These theories do not persuade us that the KPD investigation, even if tainted as to Tibbs, spilled over into a questionable ambition to convict Brantley, or that the delayed disclosure was material.

¶28 Given the other evidence against Brantley, Tibbs' testimony was not as necessary for conviction as Brantley makes out.[4] It had credibility limitations, as it was peppered with assertions of poor recollection, inconsistencies, and implausibilities, such as his claim that he never discussed with Horak or Brantley the cost or amount of the marijuana or the plan to rob Edwards. He also acknowledged that he initially lied to police and that he hoped his testimony against Brantley would gain him consideration in his own upcoming sentencing.

¶29 Brantley stresses that he believes a pervasive cover-up infected the investigation and prosecution of his case. There is no proof, however, that police were even aware of Baars' actions when they gathered evidence at the scene that implicated Brantley. He points to no evidence that the integrity of the entire prosecution was undermined. We are persuaded that the evidence was not material as to Brantley, as there is no reasonable probability that, had the Baars evidence been disclosed earlier, the result of Brantley's trial would have been different. The court's conclusion in that regard is not clearly erroneous. Brantley has not established a *Brady* violation.

---

[4] Tibbs initially moved to withdraw his plea, but after discovery related to the police investigation was conducted, Tibbs withdrew his motion and allowed his conviction and sentence to stand.

¶30     Moreover, we need not decide whether the State violated WIS. STAT. § 971.23(1)(h) by not producing the Baars evidence "within a reasonable time before trial," because any error was harmless. The court sua sponte adjourned the trial early on Friday morning to allow Brantley time to evaluate the evidence and adjust his defense accordingly before the trial resumed on Monday. We are satisfied that the beneficiary of the error, here, the State, established "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *State v. Martin*, 2012 WI 96, ¶45, 343 Wis. 2d 278, 816 N.W.2d 270 (citation omitted).

¶31     Finally, as noted above, the OLR filed a three-count complaint against Zapf stemming from Brantley's case, including that Zapf violated SCR 20:8.4(f), which makes it professional misconduct to violate a statute regulating the conduct of attorneys, here, the criminal discovery statute, WIS. STAT. § 971.23(1), by not disclosing exculpatory evidence before trial. *Zapf*, 388 Wis. 2d 1, ¶44. The supreme court found that Zapf did not violate the criminal discovery statute. *Id.* In so holding, the court agreed that the "presence of a .22 caliber bullet had no relevance to Tibbs' or Brantley's involvement in Edwards' homicide, and the failure to disclose the introduction of that bullet does not undermine in any way our confidence in Tibbs' conviction following entry of his guilty plea or in Brantley's conviction following his trial." *Id.*, ¶75.

### III.  Prosecutorial Misconduct

¶32     Brantley next asserts that Zapf manipulated the facts about Baars' conduct at the crime scene to benefit the prosecution, constituting prosecutorial misconduct not harmless beyond a reasonable doubt. Brantley points to the

OLR's three-count complaint against Zapf regarding the case and that the referee found that he violated two rules of professional conduct.

¶33    Whether prosecutorial misconduct occurred and whether such conduct requires a new trial is left to the discretion of the trial court. *State v. Bembenek*, 111 Wis. 2d 617, 634, 331 N.W.2d 616 (Ct. App. 1983). Prosecutorial misconduct violates due process if it "poisons the entire atmosphere of the trial." *State v. Lettice*, 205 Wis. 2d 347, 352, 556 N.W.2d 376 (Ct. App. 1996) (citation omitted). Reversal on this basis is drastic and should be approached with caution. *Id.* It is the defendant's burden to establish that it occurred. *State v. Harrell*, 85 Wis. 2d 331, 337, 270 N.W.2d 428 (Ct. App. 1978).

¶34    The trial court rejected Brantley's postconviction motion claim of prosecutorial misconduct. The court examined the relevant facts, applied a proper standard of law, and reached by a rational process a conclusion a reasonable judge could reach. *Lettice*, 205 Wis. 2d at 352. We see no erroneous exercise of discretion.

¶35    As noted, the supreme court reviewed the OLR complaint and the referee's report, and determined that the prosecutor did not violate the criminal discovery statute.

¶36    Brantley also points to Count 2 of the OLR complaint alleging that, relative to Zapf's examination of Officer Pie, he violated SCR 20:3.4(b), which states that a lawyer shall not "falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law." *See Zapf*, 388 Wis. 2d 1, ¶46. Pie's role was to record what the officers found during the second search of the house. Zapf called Pie as a witness on Day 4 before defense counsel was aware of the planted evidence. He did not ask her about the

backpack, Tibbs' ID, or the .22-caliber bullet, but on cross-examination, she testified that she photographed and collected Tibbs' ID and the .22-caliber bullet found inside a backpack. The gist of this charge against Zapf was that he should have asked clarifying questions after her cross-examination testimony and that her testimony on cross was the sole reason he made the belated disclosure the next day to the court and defense counsel, rather than pretrial. *Id.*, ¶47. Nonetheless, the referee found no violation, and the supreme court affirmed that conclusion. *Id.* Specifically, the court stated that "[t]o the extent that Officer Pie answered questions about those items on cross-examination that might have contributed to defense counsel having an inaccurate understanding of how those items had been found, Attorney Zapf took steps as soon as practicable to correct any misimpression defense counsel or the court may have had." *Id.*, ¶83.

¶37 Count 3 alleged, and the referee concluded, that the OLR proved by satisfactory evidence that Zapf's late disclosure to the court violated SCR 20:3.3(a)(1). That rule provides that a lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer. *Id.*; *Zapf*, 388 Wis. 2d 1, ¶48. The supreme court found that there was no violation. Again, we conclude that the circuit court did not err in coming to the same conclusion.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

13